**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Henry H. Mendoza,<br><br>      Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>      Defendant. | No. CV-07-1425-PHX-JAT<br><br>**ORDER** |

      Plaintiff Henry H. Mendoza filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of Defendant's denial of his requests for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. (Doc. #1 (Compl.).) This appeal is now before the Court on the parties' cross-motions for summary judgment. (Doc. ## 12 (Pl.'s Mot. for Summ. J.), 23 (Def.'s Cross-Mot. for Summ. J.).) After considering the parties' arguments and the evidence in the record, the Court will grant in part and deny in part both Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment.

**I.    PROCEDURAL HISTORY**

      On May 3, 2004, Plaintiff filed applications for DIB and SSI, alleging a disability onset date of October 1, 2002. (R. at 68-70.) Plaintiff claimed disabilities due to asthma,

1 blurred vision, and low back pain.[1] (R. at 53, 59.) The Social Security Administration
2 ("SSA") denied Plaintiff's application and request for reconsideration. (R. at 53-56, 59-62.)
3 Plaintiff timely requested and received a hearing before Administrative Law Judge ("ALJ")
4 Joan G. Knight on July 26, 2006. (R. at 319.)

5 On November 15, 2006, the ALJ denied Plaintiff's request for benefits, finding he was
6 not disabled within the meaning of the Social Security Act from the alleged onset date
7 through the date of the ALJ's decision. (R. at 32.) The ALJ determined that Plaintiff, despite
8 severe impairments, retained the residual functional capacity to engage in substantially
9 gainful activity. (R. at 34-39.) On May 25, 2007, the Appeals Council denied Plaintiff's
10 request for review and adopted the decision of the ALJ as the final decision of the
11 Commissioner. (R. at 7-9.) Plaintiff filed this complaint on July 24, 2007 pursuant to 42
12 U.S.C. § 405(g), seeking judicial review of the ALJ's decision. (Doc. # 1.)

13 **II.    STANDARD OF REVIEW**

14 The Court will not set aside the Commissioner's decision unless: (1) the findings of
15 fact are not supported by substantial evidence in the record, or (2) the decision is based on
16 a legal error. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "Substantial
17 evidence means more than a mere scintilla but less than a preponderance; it is such relevant
18 evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*
19 *v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Flaten v. Sec'y of Health & Human*
20 *Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). In determining whether substantial evidence
21 supports the Commissioner's decision, the court must consider the record as a whole and
22 review evidence both supporting and detracting from the decision. *Smolen v. Chater*, 80 F.3d
23 1273, 1279 (9th Cir. 1996). The ALJ's role is to make credibility determinations and to

---

[1] During his application for reconsideration of the disability determination, Plaintiff claimed for the first time that he was disabled due to blurred vision. (R. at 59.) On his initial disability report filed with the SSA over a year earlier, Plaintiff only listed asthma and lower back pain. (R. at 79.) The SSA denied his claim of blurred vision, and he does not reassert it here.

resolve conflicts in medical testimony. *Andrews*, 53 F.3d at 1039. If the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, then the court will uphold the decision. *Id.* at 1040. However, if the ALJ applied improper legal standards, the court must set aside a decision even if it is supported by substantial evidence. *See Ceguerra v. Sec'y of Health & Human Servs.*, 993 F.2d 735, 739 (9th Cir. 1991).

The claimant bears the initial burden to prove that he qualifies for disability benefits under the Social Security Act. *Andrews*, 53 F.3d at 1040. A claimant is disabled if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

Pursuant to 20 C.F.R. §§ 404.1520 and 416.920, the ALJ must perform a five-step analysis to determine whether a claimant is disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. § 404.1520(b)-(f)). First, a claimant must prove that the claimant is not currently engaged in "substantial gainful activity." Second, a claimant must demonstrate the existence of a "medically severe impairment or combination of impairments." Third, the ALJ will find that a claimant is disabled if the claimant is able to prove that the impairment equals one of a number of listed impairments that the Commissioner acknowledged as so severe as to preclude the claimant from engaging in substantial gainful activity. A finding of disability at step three ends the analysis. If an impairment does not equal one of the "listed impairments," the analysis proceeds to step four where a claimant must demonstrate that the claimant is incapable of performing past relevant work. If the claimant is successful, at step five the ALJ determines whether the claimant is able to perform other work in the national economy considering the claimant's age, education, and work experience.

In analyzing step five, the burden shifts to the Commissioner. "The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2." *Thomas v. Barnhart*,

278 F.3d 947, 955 (9th Cir. 2002) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999)); *see also* 20 C.F.R. § 416.920(f).  "If the Commissioner meets his burden, the claimant has failed to establish disability." *Thomas*, 278 F.3d at 955.

## III.    FACTUAL BACKGROUND

### A.    Plaintiff's Disability Claim

Plaintiff claims that he has been unable to work since October 1, 2002. (R. 68.) He alleges that he is disabled due to asthma, shoulder, and back pain (R. at 53, 59; Doc. # 17 (Pl.'s Mem.) at 10.)

### B.    Plaintiff's Background

Plaintiff was born on July 16, 1955, being 51 years old at the time of the hearing with the ALJ. (R. at 68, 73, 324.) He presently lives with his sister and brother-in-law. (R. at 330.) Six months before the hearing, Plaintiff stopped living with his wife who had been exposing Plaintiff to second-hand smoke by smoking inside. (R. at 329-31.) After completing the ninth grade, he did not receive a GED or any further education, technical or otherwise. (R. at 324.)

Plaintiff was employed approximately half the time between 1990 and 2001. (R. at 70, 72.) In 1991, he performed general labor at a cotton gin. (R. at 70, 88.) From May 1994 through April 1996 and again between June 1998 and August 2001, Plaintiff worked as a mechanic at an auto-body repair shop until it closed. (R. at 70, 88, 326.) He does not explain why he did not work during those periods of unemployment before 2001.

On July 26, 2006, Plaintiff testified to the ALJ that after the shop closed in 2001, he couldn't find other work because he "was getting sicker." (R. at 326.) Because of this worsening condition, Plaintiff has not worked since 2001 except for attempting to work in 2004 as a roofer with his brother. (R. at 326.) He alleges that his asthma prevented him from completing a single day of roofing. (R. at 238, 326.) Plaintiff further reported that he has at least one asthma attack each day, during which he is unable to breathe. (R. at 329.) He indicated that after taking his medication it takes an hour to an hour and a half for the attack to subside. (R. at 329.) Plaintiff also claimed that although he sleeps five hours a night, he

awakes choking for air. (R. at 338.)  He testified that he sleeps four to five hours during the day as a result of his asthma and medication regimen.  (R. at 332, 338.)

Beyond visiting his uncle next door, occasionally visiting his ex-wife, and grocery shopping, he spends about an hour outside each day.  (R. at 330, 333.)  In 2005, Plaintiff traveled to California for 3 weeks to attend a funeral.  (R. at 338.)  He does light household chores, such as meal preparation and cleaning, but only for half an hour at a time.  (R. at 334.)

### C.     Record Evidence

#### 1.     Physical Impairments

In October 2002, Cheryl Buyama, M.D., saw Plaintiff for complaints of asthma, shoulder pain, allergies, and acid reflux.  (R. at 175-76.)  Dr. Buyama refilled Plaintiff's Proventil prescription and prescribed an AeroBid inhaler with two puffs twice a day.

In 2003, Helen Zhao, M.D., treated Plaintiff for asthma exacerbation, secondary to acute bronchitis.  (R. at 172.)  Plaintiff told Dr. Zhao that he had not complied with the AeroBid prescription, only taking one puff a day.  Dr. Zhao prescribed antibiotics, re-instructed Plaintiff to take AeroBid twice a day, and administered a breathing treatment to which Plaintiff responded well.  A week later, although Plaintiff reported feeling much better, he still was not taking the AeroBid twice a day as instructed.  (R. at 170.)  Dr. Zhao changed the prescription to Advair Disk that was for only once a day.  Dr. Zhao also altered the Albuterol inhaler prescription to be only as needed.  In July 2003, Plaintiff told Dr. Zhao that he never got the Advair Disk and that he had been using the albuterol inhaler six to eight times a day.  (R. at 167.)  In March 2004, Dr. Zhao continued asthma and allergy treatments but also recommended that Plaintiff begin exercising.  (R. at 157.)

In April 2004, Jay Blum, M.D., a pulmonary physician, saw Plaintiff on referral from Dr. Zhao.  (R. at 145-49.)  Dr. Blum reviewed Plaintiff's spirogram result and called it "borderline normal."  (R. at 147.)  He also reviewed a chest x-ray, which he called "unremarkable." (R. at 148).  Dr. Blum diagnosed Plaintiff with severe persistent asthma with poor response to current therapy.  He was unsure whether Plaintiff's poor response was

due to "compliance issues versus failure to control endogenous triggers versus unspecified factors." (R. at 148.) A week after he instituted a new medicine regimen, Dr. Blum reported Plaintiff had dramatic improvement. (R. at 143.) Two weeks later, when Plaintiff's symptoms had returned, Dr. Blum again questioned Plaintiff's compliance. (R. at 141.) In March 2004, Dr. Blum found that pulmonary functions studies revealed normal ventilatory function that, when corrected for alveolar, was still consistent with asthma. (R. at 137.) Furthermore, Dr. Blum concluded that Plaintiff's "problems are as much social as medical," and that "the major problem will be compliance to the medication due to cost rather than actual disease." (R. at 138.)

On April 20, 2004, Plaintiff and his wife told Dr. Blum that he had been taking his medications "religiously." (R. at 314-15.) However, Dr. Blum was "somewhat disappointed that [Plaintiff] could not recall his medicines exactly." (R. at 315.) Because Plaintiff had "frequent urgent care visits where he gets systemic corticosteroids," Dr. Blum prescribed Xolair. (R. at 315.) Xolair made a significant improvement in Plaintiff's health, but he had problems affording it when his provider changed in 2006. (R. at 254, 263, 302.)

On September 15, 2004, Keith Cunningham, M.D. examined Mendoza on referral from the state agency. (R. at 187-98.) Dr. Cunningham found Plaintiff's breathing was clear with good air movement, with a room air saturation of 99%. (R. at 188.) Plaintiff told Dr. Cunningham that "when he does anything which requires him to 'move real fast,' he gets short of breath." (R. at 187.) At the end of the examination, however, Dr. Cunningham concluded that Plaintiff's chronic, persistent asthma was well controlled on the current medicine regimen. (R. at 191.) The record does not indicate whether Dr. Cunningham had Plaintiff's medical records.

Based on his observations and physical examination of Plaintiff, Dr. Cunningham assessed Plaintiff's ability to do work-related physical activities. (R. at 190-92 (Medical Source Statement ("MSS")).) He concluded that Plaintiff could perform medium-level work that requires the ability to sit, stand, or walk without limitations; lift or carry 50 pounds occasionally and 25 pounds frequently; frequently climb, balance, stoop, or reach, (R. at

191); and occasionally kneel, crouch, or crawl. (R. at 191-92.) Dr. Cunningham also recommended that Plaintiff avoid heights, extreme temperatures, chemical exposure, dust, fumes, and gases. (R at 191-92.)

On September 28, 2004, a state agency doctor completed a Residual Functional Capacity ("RFC) assessment form (the "2004 RFC assessment") based exclusively on Dr. Cunningham's written report and MSS. (R. at 193-200) (the record does not contain the doctor's identity other than an illegible signature.) The assessment adopted Dr. Cunningham's recommendations, with the exception that Plaintiff should never climb ladders, ropes, or scaffolds. (R. at 195.) The state agency doctor concluded that the results of Dr. Cunningham's objective exam did not support the severity of the symptoms as reported by Plaintiff. (R. at 198.)

On February 2, 2005, Salam Rafique, M.D., a pulmonary physician, performed a consultative examination, pulmonary function tests, and completed a medical source statement. (R. at 202-08.) Dr. Rafique found that Plaintiff had wheezing on forced expiration, and an oxygen saturation of 98%. (R. at 203.) After jogging in place for a few minutes, Plaintiff's oxygen saturation remained stable above 94%. Plaintiff was able to take off his shoes, walk to the examining table, lie down, sit up, squat, and stand up without any shortness of breath. (R. at 203-04.) Plaintiff's pulmonary function tests resulted in an FEV1 of close to 70%, and a significant response to bronchodilators that indicated "a very unstable airway." (R. at 204.) In his MSS, Dr. Rafique recommended that Plaintiff could do less than sedentary work: lift and carry less than 10 pounds; stand and walk less than 2 hours of an 8-hour workday; sit without limitation; occasionally kneel, crouch, or crawl; and never climb balance or stoop. Dr. Rafique also suggested that Plaintiff needs to alternate between standing and sitting, and avoid extremes in temperature, chemicals, dust, fumes, and gases. (R. at 207-08.)

On February 23, 2005, another state agency physician completed an RFC assessment form (the "2005 RFC assessment") by reviewing Plaintiff's medical records and Dr. Rafique's findings, but disagreed with Dr. Rafique's conclusion that Plaintiff could not perform

sedentary work. (R. at 212-19) (the reviewing doctor's signature is not legible.) Instead, the doctor concluded that Plaintiff could do light-level work that requires the ability to lift or carry 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk 6 hours in an 8-hour workday; and occasionally climb, balance, stoop, kneel, crouch, or crawl. The doctor felt that the only environmental limitation should be to avoid respiratory irritants. (R. at 216.) The doctor based these RFC recommendations on Plaintiff's pulmonary function test, x-ray, oxygen saturation rate before and after jogging, and the fact that wheezing was only present on forced expiration. Finally, the doctor concluded that Plaintiff was partially credible and that "the severity or duration of [his] symptom(s) [were] disproportionate to the expected severity . . . on the basis of the [Plaintiff's] medically determinable impairment(s)." (R. at 217.) The doctor reasoned that there were "an insufficient number of asthma exacerbations to meet a listing." (R. at 217.)

### 2.     **Vocational Expert**

The Vocational Expert ("VE") gave recommendations of potential employment for Plaintiff based on a hypothetical presented by the ALJ. (R. at 339-46.) The VE first summarized Plaintiff's work history and concluded that none of his previous work skills were transferable to light or sedentary work. The ALJ then asked the VE what jobs were available for someone with the same age, education, and work history as Plaintiff, but who had the light exertional limitations prescribed by 2005 RFC assessment (R. at 213), with the majority of the non-exertional limitations prescribed by the 2004 RFC assessment (R. at 194). The ALJ did not mention any limitation regarding the need to avoid extreme cold and heat. The VE testified that a person with those limitations could work as an unskilled dishwasher or packager at the light exertional level. (R. at 340.) She also testified that there were 2000 dishwasher jobs and 2200 packager jobs in Arizona. (R. at 340-41.)

## IV.    **THE ALJ'S DECISION**

The ALJ evaluated Plaintiff's alleged disability according to the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520(a) and 416.920(a). (R. 32-40.) After establishing that Plaintiff met the insured status requirements, the ALJ first determined that Plaintiff had

- 8 -

not been gainfully employed since the alleged disability onset date within the meaning of 20 C.F.R. §§ 404.1520(b) and 416.920(b).[2] (R. at 34.) Second, the ALJ found that Plaintiff had the following impairments: mild asthma that is controllable with medication; thoracic complaints; and nonsevere alcohol abuse that is currently in remission. (R. at 34.) The ALJ determined that these impairments were "severe" within the meaning of 20 C.F.R. §§ 404.1520(c) and 416.920(c).[3] (R. at 34.) Third, the ALJ concluded that Plaintiff's impairments, though severe, did not "meet[] or medically equal[] one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. at 34.) Specifically, the ALJ reviewed the medical records and found that Plaintiff "did not meet the requirements of section 3.03 for asthma, as shown by pulmonary function testing and insufficient hospital and emergency room visits." (R. at 34.)

At the fourth step, the ALJ evaluated whether the Plaintiff had the RFC to perform the mental and physical requirements of his past relevant work.[4] (R. at 34.) A claimant's RFC is "the most [he] can do despite [his] limitations." 20 C.F.R. § 404.1545. In his RFC assessment, the ALJ rejected Plaintiff's testimony as not credible, finding that the claimant's impairments "could reasonably be expected to produce the alleged symptoms, but that the symptoms are not as limiting as alleged." (R. at 37.) For her final RFC determination, the ALJ partially adopted each of the RFC assessments by State agency physicians: the non-exertional limitations of the 2004 assessment, and the exertional limitations of the 2005 assessment. (R. at 35, 193-01, 212-20.) She ruled that Plaintiff had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; to stand, walk, and sit for 6 hours each in

---

[2] If a claimant has been working in a substantially gainful activity, the SSA will find he is "not disabled regardless of medical condition or . . . age, education, and work experience." 20 C.F.R. §§ 404.1520(b), 416.920(b).

[3] Impairments are not severe if they do not significantly limit physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).

[4] If a claimant is able to perform similar past work, the SSA will not find him disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

- 9 -

an 8-hour workday; to occasionally kneel, crouch, crawl, or climb ramps or stairs; to frequently balance and stoop; but to need to avoid concentrated exposure to extreme cold, heat, fumes, and hazards. (R. at 35.)

In light of the RFC evaluations and the VE's testimony, the ALJ found that Plaintiff is incapable of performing his past work, but is capable of light work as an unskilled dishwasher or packager. (R. at 39.) There are 2,000 unskilled dishwashing positions and 2,200 light packager positions in Arizona. (R. at 39.) The ALJ then held that Plaintiff was not "disabled," as defined in sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. (R. at 40.) Accordingly, the ALJ denied Plaintiff's applications for DIB and SSI. (R. at 40.)

## V.  DISCUSSION

Plaintiff argues that "[t]he ALJ's decision is not supported by substantial evidence and is founded on multiple legal errors." (Pl.'s Mem. at 2.) Specifically, Plaintiff claims that the ALJ committed reversible error by: (1) rejecting the assessment by the agency consultative examiner; (2) failing to give clear and convincing reasons for rejecting Plaintiff's symptom testimony; (3) improperly basing the RFC determination on assessments of nonexamining state agency physicians who did not testify nor provide enough explanation for their assessments; and (4) improperly relying on the VE's job recommendations that conflicted with the ALJ's determination that Plaintiff needs "to avoid concentrated exposure to extreme . . . heat [and] fumes." Finally, Plaintiff urges the Court to remand for an award of benefits or, in the alternative, with an order instructing the ALJ to address the alleged errors.

### A.  Agency Consultative Examiner Assessment

Plaintiff argues that the ALJ went "beyond [her] expertise," and improperly rejected the assessment by the agency consultative examiner, Dr. Rafique. (Pl.'s Mem. at 17.) The ALJ concluded that Dr. Rafique's final assessment of Plaintiff's work ability was not supported by Dr. Rafique's own clinical findings nor the overall record. (R. at 37.) Because the ALJ cited Dr. Rafique's clinical observation that Plaintiff could ambulate and jog with only minor dyspnea, Plaintiff accuses the ALJ of "playing doctor" by disagreeing with Dr.

Rafique's MSS work-ability assessment. (Pl.'s Mem. at 17.)

The RFC opinion of a consultative physician, wether a specialist or not, is not binding on an ALJ's ultimate determination of a claimant's RFC. "Although [the SSA] consider[s] opinions from medical sources on issues such as . . . [a claimant's] residual functional capacity (see §§ 404.1545 and 404.1546), . . . the final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2).

The ALJ properly rejected Dr. Rafique's RFC assessment because she was not bound by it and her determination was ultimately based on substantial evidence. The ALJ's conclusion about Dr. Rafique's assessment essentially mirrored the state agency 2005 RFC assessment. The 2005 assessment cited Dr. Rafique's objective findings as not supporting the conclusion that Plaintiff could not perform sedentary work. (R. at 213-14, 218.) For example, as a basis for its conclusion, it also mentions Dr. Rafique's findings that Plaintiff was able to ambulate freely in Dr. Rafique's office without dyspnea and jog with only mild to moderate dyspnea and still maintain an oxygen saturation of 94%. (R. at 213). Thus, the ALJ, after reviewing the medical record as a whole, was merely concurring with a doctor, not "playing doctor" as Plaintiff suggests.

### B.     Plaintiff's Credibility and Subjective Testimony

Plaintiff argues that the ALJ improperly rejected Plaintiff's subjective testimony on the severity of his symptoms. Defendant counters that the ALJ provided specific and ample reasons for rejecting Plaintiff's testimony, and that the law and evidence support the ALJ's reasons.

To reject or accept the claimant's testimony, the ALJ must perform the *Cotton* and credibility analyses. *Smolen v. Chater*, 80 F.rd 1273, 1281 (9th Cir. 1996) ("The Cotton analysis is a threshold test that we set out in *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir.1986), and reaffirmed in *Bunnell v. Sullivan*, 947 F.2d 341 (9th Cir.1991) (en banc)."). First, the claimant "'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Bunnell*, 947 F.2d at 344). Upon satisfying the *Cotton* analysis and absent evidence of

- 11 -

malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so," *id.* at 1281, by specifying "which symptom testimony is not credible and what facts in the record lead to that conclusion." *Id.* at 1284.

Here, the ALJ found that Plaintiff passed the *Cotton* test when she stated that Plaintiff had a "medically determinable impairment that could reasonably be expected to produce the alleged symptom." (R. at 37.) Because there was no evidence of malingering, the ALJ proceeded to the credibility analysis and found Plaintiff not credible. The ALJ specified which of Plaintiff's statements regarding the severity of his symptoms that she rejected, and gave "specific, clear and convincing reasons" for doing so.

The ALJ specifically rejected Plaintiff's symptom testimony that, due to his asthma, he lies down 4-5 hours a day. (R. at 37.) The ALJ also questioned Plaintiff's claim that because his breathing was getting worse when he lost his job, he was no longer able to work. (R. at 37.) The ALJ based her credibility determination on several reasons. The ALJ noted that Plaintiff went to sleep when he laid down, presumably to suggest that Plaintiff's desire for lying down was to sleep rather than from being unable to move. The ALJ also noted that Plaintiff "has had low and spotty earnings for his entire career," presumably to infer that Plaintiff's trouble with continuous employment is not new.[5] (R. at 37.) Furthermore, the ALJ noted that Plaintiff was able to travel to California for 3 weeks, which would seem inconsistent with Plaintiff's claims of persistent debilitating asthma attacks and a medication

---

[5] Plaintiff accuses the ALJ of making an "implicit criticism of those who have not earned ALJ-level salaries." (Pl.'s Mem. at 8.) To support this accusation, Plaintiff cites *Johnson v. Schweiker*, 656 F.2d 424, 428 (9th Cir. 1981). There, the Ninth Circuit criticized an ALJ who had found the claimant not credible because the claimant had a "lack of motivation and cultural and social attitudes contrary to the work ethic." *Id.* The Court further noted that the claimant had worked regularly since the fifth grade. *Id. Johnson* is inapposite to the present case. Here, the ALJ's opinion is devoid of any cultural or social commentary about Plaintiff. Furthermore, Plaintiff only working half the time between 1990 and 2001 can hardly be characterized as "work[ing] with a considerable degree of regularity." *Id.*

- 12 -

1 regimen that require Plaintiff to lie down for 4-5 hours a day.

2 The ALJ also cited to the medical record to discredit Plaintiff's symptom testimony. Her first reason, however, was inadequate. (R. at 37.) The ALJ reasoned that "[t]here was no evidence of deconditioning or atrophy to corroborate" Plaintiff's contention of needing to lie down for 4-5 hours. (R. at 37.) Plaintiff again argues that the ALJ was "playing doctor" when she made this conclusion because there was no medical evidence or medical testimony by which to conclude that there must be deconditioning or atrophy to demonstrate 4-5 hours of inactivity each day. (Pl.'s Mem. at 5.). The Ninth Circuit upholds this type of inference in cases where the plaintiff alleges totally debilitating pain. *Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001) (upholding inference where there was "no evidence of disuse muscle atrophy . . . because of pain."); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (upholding inference where the claimant "did not exhibit muscular atrophy or any other physical signs of an inactive, totally incapacitated individual."). Here, however, Plaintiff is only alleging 4-5 hours of inactivity, not total inactivity. Thus, the ALJ's inference is, at best, ambiguous, and certainly not "clear and convincing."

Nonetheless, the ALJ provided additional reasons in the medical record for discrediting Plaintiff's testimony. The ALJ noted a pulmonary test result that was borderline normal. (R. at 37.) A borderline normal result is not consistent with symptoms so severe as to require immobility and unemployment.

The ALJ also discussed Dr. Rafique's findings as not supporting Plaintiff's testimony. Dr. Rafique found that Plaintiff could "walk to the examining table and get off and on it, squat down and then stand up, with no dyspnea. He also jogged in the office, with mild to moderate dyspnea, and oxygen saturation was stable above 94%." (R. at 37.) The ALJ reasoned that this kind of activity was not consistent with Dr. Rafique's conclusion that "claimant could not perform sedentary work." The 2005 RFC assessment also agreed that Dr. Rafique's work-ability assessment was not supported by, among other things, Dr. Rafique's own "objective findings." (R. at 218.)

The ALJ also noted Plaintiff's good response to bronchodilators on pulmonary

- 13 -

function testing to reflect on Plaintiff's credibility. Plaintiff argues that responsiveness to bronchodilators actually *proves* the severity of the symptoms. He points out that Dr. Rafique found this responsiveness proof that Plaintiff had a "very unstable airway." (R. at 204.) However, the 2005 RFC assessment also examined those test results when concluding that, based on his responsiveness, Plaintiff was able to perform light work. (R. at 213, 218.) The ALJ resolved this inconsistency and agreed with the 2005 assessment that also found Plaintiff's symptoms were not as severe as alleged.

The ALJ also noted other medical evidence that suggested that Plaintiff's condition was responsive to treatment by Xolair. In a consultative exam on June 26, 2006 when Plaintiff had been taking Xolair, the physician found that Plaintiff's asthma was under better control and his oxygen saturation on room air was 98%. Even though Plaintiff was no longer able to afford Xolair when his provider changed in 2006, the ALJ noted that Plaintiff's compliance had been questioned long before. For instance, as discussed above, Plaintiff repeatedly failed to comply with instructions to use Aerobid twice a day.

The Court finds that the ALJ has "offered specific, clear and convincing reasons" for rejecting Plaintiff's testimony.[6] Even though the ALJ's comment regarding atrophy would not be an adequate basis for rejection, the rest of her discussion more than adequately substantiates her conclusion that Plaintiff is not credible.

### C. Improper Basis for RFC Determination

Plaintiff's argument that the ALJ improperly based her RFC determination on assessments of nonexamining state agency physicians who did not testify or provide enough explanation for their assessments is without merit.

First, both assessments contain adequate explanation for their decisions. The 2004 assessment, in the exertional, postural, and conclusion sections, specifically refers to the accompanying medical evaluation report and MSS by Dr. Cunningham. (R. at 194-95, 197.) The 2005 assessment, as previously discussed, lists several reasons—all based on Dr.

Rafique's objective findings—why Plaintiff could perform light work. (R. at 213-14, 16-18.) While Plaintiff may not agree with the reasons provided by those doctors, the ALJ based her ultimate determination, at least in part, on those reasons. For instance, the ALJ's reasons for discrediting Plaintiff's testimony and Dr. Rafique's conclusion were identical to the reasons in the 2005 assessment.

Second, the ALJ based her determination on the medical record as a whole. Nowhere does she say that she based her RFC determination *exclusively* on the state agency RFC determinations. In fact, she cited significant portions of Plaintiff's medical record. (R. at 37-38.) At the conclusion of her discussion of Plaintiff's credibility and how the medical record supports a less severe impairment than what Plaintiff alleges, the ALJ specified that she "therefore finds that the record supports a conclusion that the claimant can perform at least light work activity, with the other limitations as outline above." (R. at 38.)

Accordingly, the ALJ properly based her RFC determination on substantial evidence in the medical record.

### D.    Vocational Expert Recommendations

Plaintiff argues that the ALJ should have required the VE to explain an alleged conflict between the job limitations in the ALJ's job hypothetical and the *Dictionary of Occupational Titles* ("*DOT*") descriptions of the VE's recommended jobs. (Pl.'s Mem. at 18.) Specifically, Plaintiff argues that the *DOT* provides that dishwashing and packaging frequently expose workers to extreme heat and atmospheric conditions, which includes fumes and odors. The ALJ's RFC determination, on the other hand, provided that Plaintiff needs "to avoid concentrated exposure to extreme cold and heat, fumes and hazards." (Tr. at 35.) The Court does not reach the issue of this apparent conflict because it finds the ALJ committed legal error by not providing the VE with a hypothetical of a person who had all of Plaintiff's limitations.

For the ALJ to rely on the VE's testimony regarding potential jobs, "the hypothetical posed must include 'all of the claimant's functional limitations, both physical and mental' supported by the record. *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (citing

*Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir.1995).) The ALJ's hypothetical to the VE did not include any mention of the need to avoid extreme cold and heat. The ALJ only posited that "[e]nvironmentally, [the hypothetical person] needs to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, and hazards." (Tr. at 340.) There was no conflict, as the Plaintiff argues, between the ALJ's hypothetical and the VE's recommendation of a dishwashing job that would frequently expose Plaintiff to extreme heat because the ALJ failed to provide that limitation in her hypothetical. Thus, the Court must remand this case for the ALJ to acquire testimony from the VE that is applicable to Plaintiff's impairments.

### E. Remand

According to the Ninth Circuit, evidence should be credited and an action remanded for the immediate award of benefits when the following three factors are satisfied: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (quoting *Smolen*, 80 F.3d at 1292). When the record is inadequate to allow for proper evaluation of the evidence, the court should remand for further development of the record. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

Here, the ALJ's hypothetical was clearly deficient for the ALJ to rely on the VE's testimony. It may be that dishwashing or packaging would not subject the Plaintiff to a sufficient concentration of extreme cold, heat, or fumes. Alternatively, there may also be other jobs more suitable for Plaintiff's limitations. The ALJ will need to provide the VE with an accurate hypothetical representing all of Plaintiff's limitations, including the need to avoid heat and cold. Thus, the Court remands this case for further development of whether appropriate work exists for Plaintiff.

### VI. CONCLUSION

The Court finds that the ALJ committed legal error in her step-five determination by

failing to propose a hypothetical to the VE that included all of Plaintiff's limitations and then subsequently relying on the VE's testimony.  Therefore, this case is remanded for further development of the record to determine if suitable work exists that conforms to the ALJ's RFC determination.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion Summary Judgment (Doc. #12) is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff's Motion is **GRANTED** regarding Plaintiff's request to remand for further development of the record.

**IT IS FURTHER ORDERED** that Defendant's Cross-Motion for Summary Judgment (Doc. #23) is **GRANTED IN PART AND DENIED IN PART**.  Defendant's Cross-Motion is **GRANTED** regarding Defendant's request to deny an immediate award of benefits.

DATED this 29th day of July, 2008.

James A. Teilborg
United States District Judge